Paul PAULSON et al., Appellants,

v.

**FOREST CITY COMMUNITY SCHOOL DISTRICT IN WINNEBAGO ET AL., COUNTIES, Iowa, et al., Appellees.**

No. 2–58353.

Supreme Court of Iowa.

Jan. 21, 1976.

Cooper, Sinnard & Beebe, Forest City, and Harley Stipp, Winnebago County Atty., for appellees.

Heard by MOORE, C. J., and RAWLINGS, REES, UHLENHOPP and REYNOLDSON, JJ.

UHLENHOPP, Justice.

This de novo appeal requires us to determine whether college students who voted at a school bond election were qualified voters.

On December 3, 1974, Forest City Community School District held an election on the question of issuing bonds to build and equip a schoolhouse. Waldorf College, a two-year liberal arts institution, is located in the School District. At the election, 145 Waldorf College students signed, and a board member approved, declarations of eligibility under § 49.77 of the Code, of which the following is a sample:

### VOTER'S DECLARATION OF ELIGIBILITY

I do solemnly swear or affirm that I am a resident of the  1st  Precinct, ____ Ward or Township, City or Town of F.C. School Dist., County of Winnebago, Iowa.

I am a qualified elector. I have not voted and will not vote in any other precinct in the Spec. School election held on 12–3, 1974.

I am affiliated with the          Party. (In Primary Election Only)

I understand that any false statement in this declaration is a criminal offense punishable as provided by law.

[signed]  Mark Anderson
Signature of Voter

          Waldorf
          Address

Approved

[signed]   BN
Board Member

Boyle, Schuler, Oltrogge & Stanton, Clear Lake, for appellants.

Those students then voted in the election.

The voting on the proposition to issue bonds was such that if 140 or more of the students voted affirmatively and if they were not qualified voters, the proposition failed. Hence the two main questions are: how did the students vote? and were they qualified voters?

Plaintiff taxpayers and voters in the School District contested the election by suit in equity against the District and the election officials. See *Patton v. Independent School Dist. of Coggon*, 242 Iowa 941, 48 N.W.2d 803.

The parties to the suit agreed to present the two main questions in this order: to seek an adjudication as to whether the students were qualified voters, and if they were not, to ascertain under subpoena how each of them voted. The parties then entered into an agreed statement of facts on the qualified-voter issue and presented the issue to the trial court on that statement. The trial court found that the students were qualified voters. Plaintiffs appealed.

Most recent litigation over students' voting rights involves a constitutional challenge by students against statutes or practices restricting student voting. Here however the situation is reversed: the students were allowed to vote, and nonstudents challenge such voting on nonconstitutional grounds.

The parties' dispute over the students' voting involves only the problem of the students' residence. Moreover, the parties agree that the students must at least be "voting residents" of the School District in order to vote there. See Code 1975, § 277.-33; *Buchmeier v. Pickett*, 258 Iowa 1224, 142 N.W.2d 426. But the parties are poles apart as to whether these students were voting residents of Forest City Community School District.

Essentially the problem of the students' voting residence involves two questions: (1) What are the Iowa *legal* requirements for voting residence? and (2) Do the *facts* show these students met those requirements?

*I. Requirements for Voting Residence.* The legal requirements for voting residence in Iowa were initially established by the Iowa Constitution, which originally stated in § 1 of article II:

Every white male citizen of the United States, of the age of twenty-one years, who shall have been a resident of this State six months next preceding the election, and of the county in which he claims his vote, sixty days, shall be entitled to vote at all elections which are now or hereafter may be authorized by law.

The First Amendment to the Iowa Constitution struck the word "white" from this section and the Nineteenth Amendment to the United States Constitution had the effect of striking the word "male."

This court gave the word "resident" in our constitution its traditional common-law meaning—domicile. *Vanderpoel v. O'Hanlon*, 53 Iowa 246, 248–249, 5 N.W. 119, 120 ("He is entitled to vote only in the county where his home is, where his fixed place of residence is, for the time being, and such place is and must be his domicile or place of abode, as distinguished from a residence acquired as a sojourner for business purposes, the attainment of an education, or any other purpose of a temporary character."); *State ex rel. Keary v. Mohr*, 198 Iowa 89, 199 N.W. 278; *Dodd v. Lorenz*, 210 Iowa 513, 517, 231 N.W. 422, 424 ("The cases almost universally interpret the word 'residence' in election statutes as meaning 'domicile.' ").

In recent times, various restrictions on voting have been challenged on several grounds. See Note, Election Laws as Legal Roadblocks to Voting, 55 Iowa L.Rev. 616; Singer, Student Power at the Polls, 31 Ohio

St.L.J. 703; Kirby, The Constitutional Right to Vote, 45 N.Y.U.L.Rev. 995; Guido, Student Voting and Residency Qualifications, 47 N.Y.U.L.Rev. 32; Note, State Residency Requirements for Purposes of Voting, 21 American U.L.Rev. 774.

In 1970 the electors repealed § 1 of article II of the Iowa Constitution and adopted the following in its place:

> Every citizen of the United States of the age of twenty-one years who shall have been a resident of this State for such period of time as shall be provided by law and of the county in which he claims his vote for such period of time as shall be provided by law, shall be entitled to vote at all elections which are now or hereafter may be authorized by law. The General Assembly may provide by law for different periods of residence in order to vote for various officers or in order to vote in various elections. The required periods of residence shall not exceed six months in this State and sixty days in the county.

The legislature implemented this new section by legislation; with one exception which we will later consider, however, we are not now concerned with that legislation, as the events here occurred under later acts.

On July 21, 1971, the Twenty-sixth Amendment to the United States Constitution became effective having the effect under the Supremacy Clause of reducing the voting age in the Iowa Constitution from 21 to 18:

> The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.

Then on March 21, 1972, the United States Supreme Court decided *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274. That case dealt with pre-election durational residency requirements. The Court invalidated a Tennessee law which required one year residence in the state *prior* to an election in order to vote. The Court stated, however, "An appropriately defined and uniformly applied requirement of bona fide residence may be necessary to preserve the basic conception of a political community, and therefore could withstand close constitutional scrutiny." 405 U.S. at 343–344, 92 S.Ct. at 1004, 31 L.Ed.2d at 285. See also *Marston v. Lewis*, 410 U.S. 679, 93 S.Ct. 1211, 35 L.Ed.2d 627.

Additionally, voting decisions by other federal courts began to cast a cloud on laws requiring an intention to *remain* in the jurisdiction permanently or indefinitely in order to have a voting residence. *Whatley v. Clark*, 482 F.2d 1230 (5 Cir.), cert. den. 415 U.S. 934, 94 S.Ct. 1449, 39 L.Ed.2d 492; *Newburger v. Peterson*, 344 F.Supp. 559 (D.N.H.) (3-judge court); *Shivelhood v. Davis*, 336 F.Supp. 1111 (D.Vt.). See Annos. 31 L.Ed.2d 861, 44 A.L.R.3d 797.

With this background the Iowa legislature overhauled the election laws in 1973. 65 G.A. ch. 136. Two provisions of that act are pertinent to our inquiry. One prescribes the voter's declaration in the form we have set out. § 156 (§ 49.77, Code 1975). The other provision defines residence for voting, § 95 (§ 47.4(4) of the Code):

> A person's residence, for voting purposes only, is the place which he declares is his home with the intent to remain there permanently or for a definite or indefinite or undeterminable length of time.

A preexisting third provision, found in § 49.9 of the Code, must be read with these provisions: "No person shall vote in any precinct but that of his residence."

To be eligible to vote in the bond election, therefore, the Waldorf students had to meet these requirements.

II. *Factual Compliance.* The students made the necessary declarations at the polls, and no one claims they tried to vote in the same time period in more than one precinct. Therefore the controversy comes down to whether they in fact met the requirements of § 47.4(4).

■ On that question plaintiffs first claim that § 47.4(4) cannot be applied literally. They say that if the section were applied in that fashion, all a person would need to do is make the declaration; that would give him an absolute right to vote whatever the facts might be.

Even the students however do not claim that much for the section. They admit that election officials and courts may look behind a declaration in case of fraud. We go a step farther. We think the legislature inserted the declaration for a purpose and that it is entitled to consideration. But other sections which were also in effect at the time demonstrate that the declaration is not conclusive. Sections 49.79 and 49.80, regarding proceedings at the polls, permit a person offering to vote to be challenged and then questioned on matters "touching his qualifications as a voter." An election official may not receive a ballot from a challenged person "until such voter shall have established his right to vote." The sections further provide, "In case of all challenges of electors at the time he is offering to vote in a precinct, a precinct election official may place such person under oath and question him as, (a) where he maintains his home; (b) how long he has maintained his home at such place; (c) if he maintains a home at any other location; (d) his age. The precinct election official may permit the challenger to participate in such questions. The challenged elector shall be allowed to present to the precinct election official such evidence and facts that he feels sustains the fact that he is qualified to vote. Upon completion thereof, the precinct election official hearing the challenge shall determine if the challenged elector shall be allowed to vote." See also 66 G.A. ch. 81, §§ 78–80, ch. 67, § 63 (amendments which became effective after these events).

In addition, in contest proceedings after elections, contestants may show, under § 57.1 of the Code, "That illegal votes have been received or legal votes rejected at the polls, sufficient to change the result."

We hold therefore that the declaration is entitled to consideration but that plaintiffs are right the election officials or a contest court may look behind it. Of course, in looking behind it, the officials or court cannot require more for a voting residence than § 47.4(4) prescribes.

■ B. Next plaintiffs claim that the students did not possess the intent required by § 47.4(4). Here plaintiffs encounter the presumption in favor of the legality of votes cast. *Dodd v. Lorenz,* 210 Iowa 513, 231 N.W. 422; 26 Am.Jur.2d Elections § 343 at 162 ("As a general rule, the ballots received and counted by duly authorized officers are presumed to be legal. This presumption carries with it the further presumption that the voters were legally qualified."); 29 C.J.S. Elections § 274 at 740–741.

The parties stipulated however that the students would testify to certain facts: that the students consider their hometown or family home to be outside the School District; they consider the School District to be their home while attending Waldorf College; they are unmarried; they attended and were graduated from high schools outside the School District; their parents do not live in the School District; the students are not employed in the School District during the summer; they are undecided whether they will stay in the School District after graduation; they consider themselves members of churches outside the School District; their automobiles are regis-

tered and they obtained their drivers' licenses outside the School District; their income tax addresses are outside the School District; and at the time of the election they were fulltime students at Waldorf College, living in dormitories on campus.

The parties' stipulation could be a sketch of the typical college student. Does such a student in fact meet the requirements of § 47.4(4) if he makes the voter declaration at the polls where he attends school?

The section contains two main parts: the declaration must state (a) that the place is the student's "home" and (b) that he intends to remain there "permanently or for a definite or indefinite or undeterminable length of time."

As to (b), the legislature has substantially lessened the requirement for voting residence. The words "permanently" and "definite," "indefinite," and "undeterminable" length of time seem to cover nearly all possibilities. "Permanently" and "indefinite" and probably "undeterminable" hark back to the language of domicile—"intention to change and to remain in the new domicile permanently or indefinitely." *Julson v. Julson*, 255 Iowa 301, 305, 122 N.W.2d 329, 331. But the word "definite" is new. The legislature has opened the door to persons who intend to live at a place until a certain time such as students—if the persons otherwise qualify.

Plaintiffs argue that this interpretation means a mere transient who intends to travel on two days later would be qualified. But plaintiffs overlook requirement (a) that the place be "home." Moreover, we will deal with cases of intention to stay a very short time when they come before us; certainly, for example, an elector who has made his home in a precinct for ten years would not be disenfranchised in an election held June 1 because he intends to move to another area on June 2.

The several students involved here may have had various intentions. Some may have intended to go to their parents' home the coming summer, never to return; then they had an intention to remain in the School District for a definite time. Some may have intended to remain in the School District until graduation; they too intended to remain a definite time. Some may not have known where they intended to be the next summer or upon graduation—maybe in Forest City, or elsewhere. Then they intended to remain only an indefinite or at least undeterminable time. In any event, they all satisfied requirement (b) of § 47.-4(4), so far as voting in the School District is concerned.

What about requirement (a)—that the college situs was their "home"? By using this term, evidently the legislature sought to avoid connotations carried by legal words such as "domicile." "Home" is "one's principal place of residence." Webster's Third New International Dictionary (1966). The American Law Institute defines it thus: "Home is the place where a person dwells and which is the center of his domestic, social and civil life." Restatement, Conflict of Laws 2d, § 12. The students argue cogently that during the college year the college situs is in fact their principal place of residence and the center of their social life. They also make a good argument that it is the center of such domestic and civil life as they have, although this may be less clear. They argue persuasively, too, that it is the place where they "dwell" during the college year.

At this point the fact that many of today's college students are not minors enters the picture. They may not only vote at 18 by virtue of the Twenty-sixth Amendment, in Iowa they achieve majority at that age. Code 1975, § 599.1. Thus many college students are adults, and adults can change even their common-law domicile, let alone their "home." Restatement, Conflict

of Laws 2d, § 15(1). The parties before us stipulated these students would testify "they consider the Forest City Community School District to be their home while they are attending Waldorf College."

■ C. But plaintiffs claim the parties' stipulation equally sustains the argument that the homes of the students' parents are really the students' homes. Various parts of the stipulation lend support to this argument: that place is the hometown or family home and the students are unmarried, their cars are registered and their drivers' licenses are obtained outside the School District, and their income tax addresses are outside the District. We thus have a situation in which two places arguably are "home."

The word "declares" in § 47.4(4) comes into play here. The legislature first enacted § 47.4(4) in 1972 as § 4(4) of chapter 1025 of the Acts of the 64th General Assembly. The subsection then read, "A person's residence, for voting purposes only, is the place which he *maintains as* his home with the intent", etc. (Italics added.) A year later the legislature changed the italicized words by § 95 of chapter 136 of the Acts of the 65th General Assembly: "A person's residence, for voting purposes only, is the place which he *declares is* his home with the intent", etc. (Italics added.)

The legislature must have intended to accomplish some change by substituting "declares is". It may very well have had situations like the present one in mind in which the home may arguably be either of two places. Other legislatures have authorized individuals to make a prima facie valid declaration of the place which constitutes their home under such dual possibilities. Ga.Code Ann.1973, § 79–402; La.Civ.Code Ann.1952, art. 42. Common-law decisions may also be found in which courts in determining domicile inclined to follow the expressed desire of an individual who had more or less equal contacts with two dwelling places. *Chambers v. Hathaway*, 187 Cal. 104, 200 P. 931; *Hurst v. City of Flemingsburg*, 172 Ky. 127, 188 S.W. 1085; *Thayer v. City of Boston*, 124 Mass. 132, 146 ("the choice of the taxpayer, as between two places of residence, is an element to be considered"); *In re Paullin's Will*, 92 N.J.Eq. 419, 113 A. 240; *Matter of Newcomb*, 192 N.Y. 238, 84 N.E. 950; *Winsor's Estate*, 264 Pa. 552, 107 A. 888.

We think the legislature intended a person's voter declaration to have some purpose and that the declaration is entitled to consideration. In the present case we find the students' declarations tip the scales in favor of their qualification to vote in the School District, when taken with the other circumstances. We thus hold as did the trial court that the students were qualified voters in the School District.

D. Plaintiffs claim, finally, that the students may qualify under § 47.4(4) to vote for candidates but this court should hold the students do not qualify to vote in referenda such as bond elections. Plaintiffs paint the picture of a large college in a small town, in which the students swamp the permanent residents and place a heavy load of bonds on them. Plaintiffs claim a "compelling interest" exists for not permitting impermanent inhabitants to vote on such questions.

■ The problem with this argument is that so far as voter qualifications are concerned, the legislature has not differentiated the rules for candidate elections from those for referenda elections. See Code 1975, § 277.33. The legislature made a policy decision here, and under our scheme of government such decisions are for that branch to make, rather than for this court. *Richards v. City of Muscatine*, 237 N.W.2d 48 (Iowa).

We intimate no opinion on the constitutionality of a statute differentiating voter

qualifications for candidate and referenda elections.

The trial court was right in holding that the students were qualified voters.

Affirmed.